574 So.2d 76 (1991)
Michael George BRUNO, Sr., Appellant,
v.
STATE of Florida, Appellee.
No. 71419.
Supreme Court of Florida.
January 3, 1991.
Rehearing Denied February 27, 1991.
*78 Richard L. Jorandby, Public Defender, and Steven H. Malone and Richard B. Greene, Asst. Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and John M. Koenig, Jr., Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Michael G. Bruno, Sr., was convicted of the first-degree murder of Lionel Merlano. The jury recommended death by a vote of eight to four, and the judge imposed the sentence of death. We have jurisdiction of this appeal pursuant to article V, section 3(b)(1) of the Florida Constitution.
Direct evidence of how the crime occurred was furnished by Bruno's fifteen-year-old son, Michael, Jr., and by Bruno himself in the form of a taped confession. According to Michael, Jr., he and his father went to Merlano's apartment on the night of August 8, 1986. After drinking some beer and listening to the stereo, Bruno went to the bathroom. Later, when Merlano was playing with the stereo, Bruno pulled a crowbar from the front of his trousers and began hitting Merlano. The man fell to the floor but appeared to still be alive. Bruno told Michael, Jr., to bring him a gun from under the sink in the bathroom. Michael, Jr., obtained the gun and handed it to his father. Bruno put a pillow over the gun and shot Merlano twice in the head. Bruno made several trips back to Merlano's apartment for the purpose of stealing the stereo and its associated equipment. Merlano's body was not found until August 11, 1986.
In his taped confession, Bruno said that he and his son drank some beers with Merlano in his apartment. Bruno was carrying a crowbar. Merlano began playing his stereo and "started getting loud with my son." Ultimately, a fight erupted between Bruno and Merlano. Bruno hit Merlano with the crowbar several times. Merlano retrieved a pistol from his room, but Bruno hit him again and thought he knocked Merlano unconscious. When Bruno began to walk away, Merlano reached for the gun, but Bruno grabbed it and shot him in the head once or twice.
In addition, Christopher Tague testified that Bruno borrowed his .22-caliber revolver in late July or early August of 1986. On August 8, 1986, Tague testified that Bruno borrowed another man's car so that he and his son could go to the apartments where *79 Merlano lived. Bruno returned alone about one-and-a-half to two hours later. Tague also testified that on August 11, 1986, at Bruno's request, Tague, Bruno, and Jody Spalding stopped at Merlano's apartment because Bruno wanted to remove some "prints." Bruno could not get into the apartment, so they left. Diana Liu testified that on the night of the murder she was in the pool area at Merlano's apartment complex. Bruno asked her if she wanted to go to another party, stating "[i]t's a murder party. It's going to be a great killing." Arthur Maheu testified that on a Saturday morning in early August 1986, he observed a.22-caliber pistol under the pillow on which Bruno was laying. Bruno told Maheu that the stereo equipment "came from this house where he killed this guy, and he ransacked it."
Jody Spalding testified that early in the morning on August 9, 1986, Bruno told him "that he had just gotten into a big fight with this guy and he was dead." He further told him "that he was going to get some equipment and stuff from the guy's house." Later that morning, Jody saw Bruno with a VCR and other electronic equipment, and he told him that "he got it from the guy's house who he killed." They then left together to go to Bruno's parents' house, but on the way they stopped at a canal into which Bruno threw what looked to be a "steel bar" wrapped up in a cloth. They went to another canal into which Bruno threw a gun also wrapped in cloth. At another canal Bruno threw in the cylinder from the gun. Later in the week, Bruno called Jody and asked him to throw away a pair of shoes for him because he had gotten blood on them when he was "murdering this guy." An expert firearms examiner testified that one of the projectiles recovered from the victim was fired from the gun retrieved from the canal.
Bruno first argues that his confession should have been suppressed because it was obtained by coercion and improper promises with respect to the treatment of his son. The record reflects that when the police first approached Bruno he told them that he was not involved in the killing. After obtaining other evidence, the police arrested Bruno and took him to the station. Detective Edgerton, who was in charge of the investigation, told Bruno that while the police did not have any evidence linking his son to the crime, they thought his son was involved. At some point that evening, he also told him that if Michael, Jr., was involved, he would likely go to jail. Following Miranda[1] warnings, Bruno told the officers that he had already told them everything he knew. Thereupon, the police terminated the questioning.
Later, when Lieutenant Manfre was checking on Bruno pursuant to department regulations, Bruno initiated a conversation with Manfre and began expressing concern about his son who was also being held by police at that time. When asked what would happen to his son, Manfre told Bruno that "only he would know what would happen to his son because he would know what the total involvement of his son was in this case." Bruno then indicated that he wanted to talk about the case. Manfre told Bruno that he did not want to take any statements from him but that if he wanted to talk to Detective Edgerton, Manfre would notify the detective. Manfre then told Edgerton that Bruno desired to make a statement. Edgerton once again gave Bruno the appropriate Miranda warnings, after which Bruno made a recorded confession.
While Bruno gives a different version of these events, the trial judge could properly find that no improper promises were made. Even taking into account that Detective Edgerton later testified at the trial that he had told Bruno that if he gave a sworn statement exculpating his son, his son would not be charged, the record supports the conclusion that the confession was freely and voluntarily made. The police legitimately believed that Bruno's son was involved but recognized that if Bruno gave a sworn statement exculpating his son there would be no basis upon which his son could be charged. Statements suggesting leniency are only objectionable *80 if they establish an express quid pro quo bargain for the confession. State v. Moore, 530 So.2d 349 (Fla.2d DCA 1988). Before taking his confession, Edgerton specifically told Bruno that the police would not make any promises to either Bruno or his son, and if he wanted to give a statement, it was of his own accord. There was no police overreaching, and the fact that Bruno's confession was motivated in part by concern over the welfare of his son does not provide a basis for suppressing the confession.
Relying upon Haliburton v. State, 514 So.2d 1088 (Fla. 1987), Bruno further argues that the police should have stopped questioning him when an attorney hired by his family to represent him called the station and asked the police not to take any statements from Bruno. We need not decide whether a telephone request to cease questioning was sufficient to trigger the principle of Haliburton because there was sufficient evidence to support the judge's conclusion that this call came after Bruno confessed. Moreover, Haliburton does not have retroactive application and Bruno's confession occurred before our decision in Haliburton. Jones v. State, 528 So.2d 1171 (Fla. 1988). Bruno's remaining attacks on his confession are totally without merit.
Bruno also assails the testimony of two witnesses who said they did not immediately report their activities to the police because they were afraid that Bruno might harm them or their families. Absent direct threats attributable to the defendant, testimony such as this should be limited to rebuttal after the witness's credibility has been attacked for not promptly reporting the defendant's conduct. However, defense counsel failed to preserve this point by making appropriate objections. In any event, in view of the overwhelming evidence of guilt, the admission of this testimony would constitute no more than harmless error.
Bruno was also convicted of robbery. Asserting that there was insufficient evidence of robbery, he attacks both this conviction and the instruction on first-degree felony murder which was predicated upon the underlying crime of robbery. He contends that the taking of the stereo was nothing more than an afterthought that was unrelated to his attack on Merlano. However, the state presented evidence that one month prior to the murder Bruno asked Steve Mizella if he could use his car to borrow a bunch of stereo equipment. On the night of the killing, Bruno borrowed Mizella's car and said he was going "[t]o get stereo equipment." While at Merlano's apartment he was admiring the stereo just prior to hitting Merlano over the head with a crowbar. When he took his son back home, Bruno told Spalding that he was going back to get some stereo equipment from the "guy's house who he killed." He thereafter took Spalding's mother's car to remove the electronic equipment. From this sequence of events, the jury could reasonably conclude that Bruno possessed the requisite intent to commit the crime of robbery at the time he committed the murder.
Bruno also contends that the trial judge erred in failing to properly instruct the jury on excusable homicide. The judge gave the short-form standard jury instruction on excusable homicide which has been held to be inadequate in Blitch v. State, 427 So.2d 785 (Fla.2d DCA 1983), and Bowes v. State, 500 So.2d 290 (Fla.3d DCA 1986), review denied, 506 So.2d 1043 (Fla. 1987). However, defense counsel did not object to the instruction, and the giving of the instruction, as worded, is not fundamental error. State v. Smith, 573 So.2d 306 (Fla. 1990). Likewise, Bruno cannot complain of the failure to give the long-form standard instruction on excusable homicide because his counsel did not request it. In any event, there was no evidence in the record to justify giving the long-form instruction on this offense.
Bruno is correct in his assertion that the instruction on manslaughter was erroneous because it did not refer to justifiable and excusable homicide in connection with the definition of manslaughter. Rojas v. State, 552 So.2d 914 (Fla. 1989). This would constitute fundamental error if Bruno had been convicted of only second-degree *81 murder. However, the error is rendered harmless because Bruno was convicted of first-degree murder, which is two steps removed from the crime of manslaughter. Rojas; Lomax v. State, 345 So.2d 719 (Fla. 1977).
We reject without discussion the balance of Bruno's guilt-phase claims which include the following:
(1) The first-degree murder conviction on alternative theories must be reversed.
(2) The trial court erred in failing to have a court reporter present during bench conference during voir dire.
(3) The trial court erred in refusing to release grand jury testimony or to have an in camera inspection of the grand jury testimony.
(4) The court erred in letting the prosecution pursue a felony murder theory as the indictment gave no notice of such a theory.
(5) The trial court erred by denying appellant's motion for psychiatric examination of the state's star witness.
(6) Appellant was denied due process of law and the presumption of innocence by repeated testimony about his arrest and jail status.
(7) The submission of the case to the jury without the presentation of a defense case requires a new trial for appellant.
(8) The prosecutor's closing argument in the guilt phase deprived Mr. Bruno of a fair trial and is fundamental error.
(9) The trial court gave erroneous instructions on justifiable homicide.
(10) Appellant was denied his right to be present at several stages of the proceeding.
(11) The trial court erred in allowing the bailiff to respond to a substantive jury request without the presence of the judge, defendant, or defense counsel.
(12) The trial judge erred in communicating with the jury without any prior consultation with defense counsel or defendant, especially where such communication was designed to coerce the jury into reaching a verdict.
As the basis for the sentence of death, the trial judge found the following aggravating circumstances:[2]
(a) Prior conviction of a prior violent felony;
(b) Murder committed while defendant was engaged in the crime of robbery;
(c) Murder committed for the purpose of avoiding or preventing lawful arrest;
(d) Murder committed for pecuniary gain;
(e) Murder was especially heinous, atrocious, or cruel;
(f) Murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
However, the judge concluded that there were only three aggravating circumstances which could be considered in passing sentence because he concluded that the circumstances listed as (a), (b) and (c) were based on the same aspect of the criminal episode.
We agree with the trial court that only three aggravating circumstances were proper for consideration, although we arrive at this conclusion in a somewhat different manner. The aggravating circumstance of a prior violent felony was inapplicable because the felony in question was the contemporaneous conviction of the robbery of Merlano. Wasko v. State, 505 So.2d 1314 (Fla. 1987). However, the trial court did properly find that the murder was committed during a robbery and was committed for pecuniary gain. These two circumstances are based on the same aspect of the criminal episode and should properly be considered as a single aggravating factor. The evidence was insufficient to support the finding that the murder was committed for the purpose of avoiding or preventing a lawful arrest. Standing alone, the fact that the victim could identify the murderer does not prove beyond a reasonable doubt that the elimination of a witness was a dominant motive for the *82 killing. Floyd v. State, 497 So.2d 1211 (Fla. 1986).
Further, contrary to Bruno's argument, we do believe that there is sufficient evidence to support the finding that the murder was especially heinous, atrocious, or cruel. As noted by the judge in his sentencing order:
From the evidence presented the Defendant savagely beat the victim in the head and shoulders with a crowbar in excess of ten times. The victim had self defense wounds on his hands and the Defendant continued the savage beating until the victim was no longer capable of resisting. The Court finds that the death was a result both of a consequence of the robbery and of the Defendant's premeditated design. The Defendant's use of the crowbar was not necessary either to incapacitate the victim to complete the robbery nor to effect his death, as the Defendant was also armed with a handgun. The Defendant's use of the crowbar was clearly especially atrocious and cruel.
The victim begged the Defendant's son to save him from the Defendant's savage attack. The victim's acute awareness of his impending death and the Defendant's continued assault in the face of the victim's pleas make this an especially cruel murder.
We also conclude that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Despite Bruno's contention during the sentencing proceeding that the killing simply took place as a result of a fight, there is substantial evidence that Bruno planned to kill Merlano before he went to his apartment. As noted by the judge in his sentencing order:
From the evidence presented the Defendant, after administering his savage beating which rendered the victim helpless, shot the victim twice in the head at point blank range through a pillow. This was especially cold, calculated and premeditated. It was essentially an execution. The Defendant also had planned to kill his victim for a considerable time as he had announced his intention to kill the victim approximately two weeks prior to the murder. There is no pretense of moral or legal justification for this murder.
Therefore, we conclude that the murder was aggravated by the three following valid factors: (i) that the murder was committed during a robbery and for pecuniary gain; (ii) that the murder was heinous, atrocious, or cruel; and (iii) that the murder was cold, calculated, and premeditated.
The main focus of the evidence presented in mitigation was Bruno's long-time use of drugs. Dr. Stillman, a psychiatrist, testified that Bruno's drug abuse had left him with some brain damage. However, the trial judge found no mitigating circumstances. With respect to the statutory mitigating circumstance that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, the judge's sentencing order stated:
This mitigating circumstance does not apply in this case. The Court has considered the testimony of Dr. Stillman presented at the advisory phase, and makes a factual finding which rejects the Doctor's opinions regarding the Defendant being extremely mentally or emotionally disturbed.
In referring to the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, the judge's sentencing order states:
This mitigating circumstance does not apply in this case. The Court has considered the Defendant's use of drugs prior to and at the time of the murder, but finds in light of the circumstances of the offense and the Defendant's own testimony in the advisory hearing as to his state of mind, that he had no substantial impairment.
While it is undisputed that Bruno had a long history of drug abuse, we find that the judge could properly make the foregoing findings. Viewing Dr. Stillman's testimony as a whole, we believe the trial *83 judge had the discretion to discount much of his opinion. Moreover, Bruno testified at length in the penalty phase, and the judge had an opportunity to evaluate his mental capacity. Despite his use of drugs, Bruno had worked as a member of a band and thereafter as a mechanic. He articulately endeavored to try to exonerate himself of blame for killing Merlano whom he described as a "nut shop." His only reference to using drugs or intoxicants on the night of the murder was the statement that he drank a beer before going to Merlano's apartment.
In light of three statutory aggravating circumstances and no statutory mitigating circumstances, we find no error in the judge's sentence of death. We also reject Bruno's argument that his sentence is disproportionate to other cases involving the death sentence.
We reject the balance of Bruno's penalty-phase claims which include the following:
(1) The trial court gave unlawful deference to the jury's death recommendation.
(2) The trial court committed Gardner[3] error.
(3) The trial court erred by relying on the presentence investigation report.
(4) The trial court erred in failing to adequately consider, find, or weigh mitigation.
(5) The trial court erred in failing to conduct an evidentiary hearing, declare a mistrial or continuance of the penalty phase when the dispute between trial counsel and his mental health expert was brought to the court's attention.
(6) The jury was misled as to its role in the sentencing process.
(7) The state unlawfully used nonstatutory aggravation in its case in chief and its cross-examination.
(8) The jury was improperly instructed on aggravating circumstances.
(9) The prosecutor unlawfully derided mental health evidence and argued an improper standard for considering it.
(10) The prosecutor made an improper argument on aggravating and mitigating circumstances.
(11) The evidence in mitigation calls for a sentence of less than death.
(12) Florida's capital sentencing statute is unconstitutional because (a) the especially heinous, atrocious, or cruel and the cold, calculated, and premeditated aggravating circumstances are so vague that they cannot provide proper guidance to the sentencer; and (b) Florida's vague application of its premeditated aggravator fails to properly guide the sentencer.
Bruno correctly points out that his life sentence for robbery must be vacated because no guidelines scoresheet was filed with the court demonstrating the basis for departure. In Pope v. State, 561 So.2d 554 (Fla. 1990), this Court recently held that when an appellate court reverses a departure sentence because there were no written reasons, the court must remand for resentencing within the sentencing guidelines.
We affirm the murder conviction and the sentence of death. We also affirm the robbery conviction but vacate the robbery sentence and remand for resentencing within the guidelines.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] See § 921.141(5), Fla. Stat. (1985).
[3] Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).