807 So.2d 55 (2001)
Michael G. BRUNO, Sr., Appellant,
v.
STATE of Florida, Appellee.
No. SC92223.
Supreme Court of Florida.
December 6, 2001.
Rehearing Denied February 5, 2002.
*60 Todd G. Scher, Litigation Director, Office of the Capital Collateral Regional Counsel-South, Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Michael J. Bruno, under sentence of death, appeals the denial of relief following an evidentiary hearing on his first motion filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the denial of relief.

I. FACTS
The facts of the crime are set out fully in the Court's opinion on direct appeal.[1] On August 8, 1986, appellant Michael Bruno and his fifteen-year-old son, Michael Jr., were in the apartment of a friend, Lionel Merlano, when Bruno beat Merlano with a crowbar. Bruno then sent Michael Jr. elsewhere in the apartment to fetch a handgun and, when the boy returned with a gun, Bruno shot Merlano twice in the head. Bruno was arrested several days later and gave a taped statement wherein he at first denied any knowledge of the murder but then later admitted committing the crime, claiming it was self-defense. Michael Jr. also gave a full statement to police. Prior to being arrested, Bruno made numerous inculpatory statements to friends concerning both his plan to commit the murder and the commission of the crime itself. Police found the gun in a canal where a friend, Jody Spalding, saw Bruno throw it.
Bruno was charged with first-degree murder and robbery (he stole a stereo from the apartment after the murder) and his strategy at trial was to raise a reasonable doubt in jurors' minds by claiming *61 that Jody Spalding was the killer. He was convicted as charged, and the judge followed the jury's eight-to-four vote and imposed a sentence of death based on three aggravating circumstances[2] and no mitigating circumstances. This Court affirmed. Bruno filed the present rule 3.850 motion[3] and the trial court conducted an evidentiary hearing at which Bruno presented six witnesses[4] and the State presented one witness.[5] The trial court denied the motion. Bruno appeals, raising four issues.[6]

II. INEFFECTIVE ASSISTANCE OF COUNSEL
In issue number one, Bruno argues that the trial court erred in denying his postconviction claims concerning alleged ineffective assistance of counsel. The test to be applied by the trial court when evaluating an ineffectiveness claim is two-pronged: The defendant must show both that trial counsel's performance was deficient and that the defendant was prejudiced by the deficiency.[7] The standard of review for a trial court's ruling on an *62 ineffectiveness claim also is two-pronged: The appellate court must defer to the trial court's findings on factual issues but must review the court's ultimate conclusions on the deficiency and prejudice prongs de novo.[8]
In his brief before this Court, Bruno asserts several instances of ineffectiveness.[9] We address each of the subclaims in turn. In subclaim two,[10] Bruno contends that defense counsel was ineffective during the trial due to alcohol and drug impairments. Bruno points to the previous hospitalization of trial counsel for drug and alcohol use. Private counsel was retained in August 1986 to represent Bruno. Over the next few months, counsel developed a drinking problem and, when he was drinking, would occasionally use cocaine. He enrolled in Alcoholics Anonymous on October 15, 1986, and remained alcohol and drug free from then until March 1987, when he began drinking again but not using cocaine. He admitted himself into a hospital on March 15, 1987, for his drinking problem, remained hospitalized for twenty-eight days, and subsequently remained alcohol and drug-free. After being released, counsel apprised both Bruno and the court of his problem and offered to withdraw, but Bruno asked him to continue as counsel. The trial, which originally had been set for March 30, 1987, was rescheduled for August 5, 1987, and began on that date. Counsel testified at the evidentiary hearing below that he never was under the influence of alcohol or drugs while working on this case. The trial court concluded that Bruno "failed to meet his burden of demonstrating how [counsel's] drug and alcohol usage prior to trial rendered ineffective his legal representation to the Defendant and how such conduct prejudiced the Defendant." We agree.
In subclaim three, Bruno asserts that there was an irreconcilable conflict between Bruno and counsel. Bruno argues that defense counsel repeatedly divulged confidential and damaging information to the trial court. One example of this alleged conflict concerns statements made *63 by defense counsel at the close of the State's case during the guilt phase. Defense counsel informed the trial court that Bruno wanted to testify and present witnesses against counsel's advice. Defense counsel told the court that he believed the witnesses would be detrimental to his case. Defense counsel added that he advised Bruno to take a plea in this case. The trial court told Bruno that he had the right to testify, but that if he chose not to, he would instruct the jury not to infer anything from it. The trial court also told Bruno that by presenting witnesses, he would lose first and last closing arguments. The defense ultimately rested its case without the presentation of witnesses.
Another example of the alleged conflict of interest relates to comments made by defense counsel during the penalty phase. The comments were made in response to Dr. Stillman's testimony that Bruno was insane at the time of the offense. Shortly after Dr. Stillman's testimony, defense counsel requested a side-bar conference and told the trial court that he was surprised by the testimony, as Dr. Stillman had previously informed defense counsel that Bruno was sane at the time of the offense. At the evidentiary hearing below, defense counsel explained that he conveyed his surprise to the court in order to justify his subsequent motion for an additional psychological examination.
The trial court concluded that this claim was barred because it either was, or could have been, raised on direct appeal. This was error. Whereas the main question on direct appeal is whether the trial court erred,[11] the main question in a Strickland claim is whether trial counsel was ineffective.[12] Both claims may arise from the same underlying facts, but the claims themselves are distinct andof necessity have different remedies: A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion,[13] and a claim of ineffectiveness generally can be raised in a rule 3.850 motion but not on direct appeal.[14] A defendant thus has little choice: As a rule, he or she can only raise an ineffectiveness claim via a rule 3.850 motion, even if the same underlying facts also supported, or could have supported, a claim of error on direct appeal. Thus, the trial court erred in concluding that Bruno's claim was procedurally barred.
*64 Despite ruling that claim three was procedurally barred, the trial court proceeded to address the claim on the merits:
This motion was filed by [defense counsel], after Dr. Stillman testified at the penalty phase, that because of drug and alcohol usage, that the Defendant was not sane at the time the offense was committed. [Defense counsel] indicated to the trial judge that this testimony took him by surprise, because Dr. Stillman was examining the Defendant to render an expert opinion as to possible mental mitigating circumstances, not whether he was sane at the time the crime was committed. [Defense counsel] told the trial judge that prior to Dr. Stillman's testimony, that he had no reason to believe that the Defendant was not competent to stand trial or was insane at the time the offense was committed. [Defense counsel] testified that he explained his surprise to Judge Coker, in order to justify his subsequent motion for an additional psychological examination.
. . . .
This Court does not find that there is any evidence of a "conflict of interest" between [defense counsel] and the Defendant, or that the Defendant was prejudiced by [defense counsel]'s statements to the Trial Judge. [Defense counsel]'s statements to the Trial Judge were made as a justification for his seeking leave of court to file a belated notice of intent to rely on an insanity defense, pursuant to rule 3.216(f). The evidentiary hearing revealed that [defense counsel] was having difficulty with the Defendant as to whether the Defendant should or should not testify, and whether certain alibi witnesses who lacked credibility should be called to testify by the defense. The testimony of [defense counsel] does not reflect a lack of preparation, but reflect his conflicts with the Defendant as to the conduct of the trial. [Defense counsel] stated that he advised the Defendant that "strategy wise," he would be better off not testifying. [Defense counsel] felt that the witnesses which the Defendant wanted to call were not credible, and would result in the loss of first and last closing argument by the defense. [Defense counsel] testified that he had strongly recommended to the Defendant that he take a plea in the case, which advice the Defendant elected to reject. [Defense counsel]'s statements to the trial judge did not amount to a "conflict of interest," but was an effort to seek the trial court's help with a client who constantly refused to cooperate with his defense counsel's trial preparations.
The Defendant has failed to show that he was prejudiced by [defense counsel]'s statements to the trial judge.
Ultimately, the trial court concluded that Bruno failed both prongs of the Strickland test. We agree.
In subclaim four, Bruno argues that counsel was ineffective because he failed to present a defense of voluntary intoxication. At the evidentiary hearing below, defense counsel testified that Bruno adamantly refused the presentation of a voluntary intoxication defense. In rejecting this claim, the trial court stated that "[t]he decision not to present the affirmative defense of `voluntary intoxication,' was based on a strategy decision which was motivated by the Defendant's conscious decision, rather than a result of [counsel's] legal incompetency." We agree with the trial court that Bruno has failed to satisfy the first prong of the Strickland test.
In subclaim five, Bruno asserts that counsel negligently failed to move to suppress Bruno's initial statement to the police. The trial court erroneously concluded *65 that this matter was procedurally barred. The issue raised by Bruno on direct appeal involved the suppression of his August 13, 1986, confession. The instant claim concerns defense counsel's alleged ineffectiveness for failing to move to suppress Bruno's August 12, 1986, initial statement to the police. This issue was not addressed on direct appeal and is therefore properly raised at this time.
Bruno was first interrogated by the police on August 12, 1986. Bruno alleges that he was not given Miranda[15] warnings at this time. During the interrogation, Bruno told the police that he knew the victim and had previously consumed a few beers with the victim at the victim's apartment, which was located in the Candle-wood apartment complex. Bruno told the police that, the weekend the crime was committed, he was working on Jody Spalding's car, with the exception of going to the Candlewood apartment complex to obtain a receipt for a refrigerator that Sharon Spalding had bought from a man named Jim. Bruno's statement was introduced at trial through the testimony of Detectives Hanstein and Edgerton. Bruno claims that this statement provided the police with additional evidence, as it contradicted the later statement in which Bruno claimed that he killed the victim in self-defense, it contradicted other testimony about his whereabouts in the days following the killing, and shows guilty knowledge.
Although the trial court concluded that this issue was procedurally barred, it nevertheless addressed the issue on the merits. The trial court concluded that Bruno failed to meet the second prong of the Strickland test.[16] We agree, as Bruno has failed to demonstrate that there is a reasonable probability that, but for the admission of his exculpatory statement, the verdict would have been different.
In subclaim six, Bruno asserts that defense counsel was negligent for failing to investigate and challenge his confession on the ground that Bruno was intoxicated at the time he gave the statement. The trial court incorrectly concluded that this issue was procedurally barred. Nevertheless, we find that Bruno has failed to meet the first prong of the Strickland test. At the evidentiary hearing below, Dr. Lipman testified that based on his interview with Bruno, he believed that Bruno was hallucinating at the time he gave his statement to the police. Initially, we note that Dr. Lipman based this conclusion on self-serving recollections provided by the defendant himself. More importantly, at the time of trial, there was no evidence in the record to support such a theory of intoxication. Dr. Stillman testified during the penalty phase regarding Bruno's drug abuse, both prior to the murder and while awaiting trial in jail. He did not indicate that Bruno was under the influence of drugs on the date of the confession. Cf. Cherry v. State, 781 So.2d 1040, 1052 (Fla. 2000) ("The fact that Cherry found a new expert who reached conclusions different from those of the expert appointed during trial does not mean that relief is warranted under Florida Rule of Criminal Procedure 3.850, especially where there is no evidence other than Dr. Crown's statement that Dr. Barnard conducted a superficial *66 examination that Dr. Barnard's evaluation was insufficient.") (citation omitted). Additionally, at the conclusion of the confession, Bruno stated on the record that he was not under the influence of drugs or alcohol. Thus, counsel cannot be deemed ineffective for failing to pursue a theory which there is no evidence in the record to support.
In subclaim seven, Bruno alleges that counsel failed to effectively challenge the State's case. Within this argument, Bruno raises several subclaims: counsel failed to impeach Diane Liu, Bob Bryant, Sharon Spalding, Archie Maheu, Jody Spalding, and Bruno's son (Michael Jr.); counsel failed to object to "fear" testimony; and counsel failed to object to the instruction coercing the jury to reach a verdict. The trial court rejected the claim regarding impeachment as follows: "Decisions on these matters were tactical choices, and are within the standard of competency of defense counsel." We agree and therefore Bruno has failed to meet the first prong of the Strickland test. The trial court correctly determined that the claim regarding the "fear" testimony is procedurally barred. On direct appeal, this Court pointed out that defense counsel failed to preserve this issue by making appropriate objections. Nevertheless, this Court proceeded to address the issue on the merits and conclude that the claim "would constitute no more than harmless error." Bruno, 574 So.2d at 80. Finally, the trial court concluded that the claim regarding the alleged coercive instruction was also procedurally barred. It is understandable why the trial court came to this conclusion, as in this Court's direct appeal opinion, we stated, "We reject without discussion the balance of Bruno's guilt-phase claims which included the following." Id. at 81. We proceeded to list a number of claims, one of which was the alleged coercive instruction claim. Yet, although this claim was raised on direct appeal, it is not clear from the opinion itself how this Court disposed of the claim: it may have been barred due to a failure to preserve or it may have been denied on the merits. If the claim was denied on the merits, then the claim would be barred in a subsequent postconviction motion. If, however, the claim was denied due to counsel's failure to preserve the issue for appellate review, then a postconviction motion would be the proper vehicle to raise such a claim. In order to make this determination, we look to the direct appeal record and briefs. Upon review, it appears that the State asserted that in its direct appeal answer brief that the coercive instruction claim was not preserved for direct appeal because counsel had failed to object to the instruction at trial. We must assume that this argument was accepted by this Court on direct appeal. Thus, the coercive instruction is properly raised in a postconviction motion in the form of an ineffective assistance of counsel claim.
Turning to the merits of the claim, we conclude that Bruno has failed to meet the first prong of the Strickland test. After the jury had deliberated for a number of hours, the trial court called the jury into the courtroom and the following transpired:
THE COURT: Ladies and Gentlemen of the jury, according to my calculations, its been some 26 hours ago that I sent you all back to the juryroom. Since that time, we have heard practically nothing from you. I would like to inquire is there some problem that the court might be of some assistance as you deliberate?
MR. GILLS: Your honor, not at this time. We're coming pretty close.
THE COURT: Okay. I will speak to you again shortly. You may retire.
*67 At the evidentiary hearing below, defense counsel testified that he did not object because he believed that the trial court was merely curious about the jury's progress in deliberations and its tone was not such as to constitute a de facto Allen[17] charge. Based on our review of both the trial record and defense counsel's testimony at the evidentiary hearing below, we find no merit to this claim.
In subclaim eight, Bruno asserts that counsel was ineffective for failing to object to the guilt-phase jury instructions. Specifically, Bruno alleges that counsel was ineffective because he failed to object to inaccurate and incomplete instructions on excusable homicide and justifiable homicide. The trial court correctly determined that the part of the claim dealing with the excusable homicide instruction was procedurally barred, as this Court concluded on direct appeal that there was no evidence to support giving the long-form instruction on this offense. See Bruno, 574 So.2d at 80. However, the trial court incorrectly determined that the part of the claim dealing with justifiable homicide was barred, as this was one of the laundry list claims rejected by this Court without discussion on direct appeal. The issue is therefore properly raised in this postconviction motion. Turning to the merits, Bruno argues that the justifiable homicide instruction was inaccurate because it failed to clearly explain defense of another as self-defense. Our review of the record, however, reveals that the following instruction was given to the jury:
A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another. (Emphasis added.) This instruction correctly explains defense of another. Hence, we find no merit to Bruno's claim.
In subclaim nine, Bruno alleges that counsel failed to ensure that the jury challenges were recorded. During jury selection, there were several unreported bench conferences, one of which involved the parties exercising challenges to the jury venire. Bruno alleges that errors may have been committed during these unreported conferences. Again, the trial court improperly concluded that this claim was procedurally barred, as this claim was part of the laundry list of claims denied without discussion on direct appeal. Nevertheless, we find no merit to this claim, as Bruno failed to establish either prong of the Strickland test. Mere speculation regarding possible error is not enough to satisfy Strickland. Counsel testified at the evidentiary hearing below that at the time of the trial in this case, the practice was to write juror challenges on slips of paper that were submitted to the judge, rather than discussing the challenges at sidebar. Counsel did not remember making any specific challenges for cause, requesting additional peremptory challenges, or being limited by the court in voir dire. Ultimately, Bruno points to no specific error which occurred during these alleged unreported conferences. See Ferguson v. Singletary, 632 So.2d 53, 58 (Fla. 1993). Therefore, we find no merit to this claim.
In subclaim ten, Bruno argues that counsel was ineffective in failing to investigate and present available mitigation. The trial court rejected this claim as follows:
The testimony and exhibits presented at the evidentiary hearing reflect that the Defendant's mis-information to, and *68 his failure to fully co-operate with [counsel] in the preparation of his defense, prevented [counsel] from initially obtaining information relating to the Defendant's previous hospitalization at Pilgrim State Hospital. An examination of Dr. Stillman's trial testimony, reveals that he acquainted the jury with the Defendant's extensive emotional and drug history, and drug use at the time of the murder. The Defendant's parents testified that Mr. Bruno had tried to commit suicide, and was briefly hospitalized until his sister had him released. The fact that there could have been a more detailed presentation of these circumstances, does not establish that defense counsel's performance was deficient. Defense counsel cannot be faulted for failing to investigate background information, which he had no reason to suspect existed.
We agree. The trial court noted that Bruno's failure to cooperate with counsel prevented counsel from initially obtaining relevant information pertaining to the penalty phase. Despite this obstacle, counsel still presented evidence concerning several potential mitigating circumstances: Bruno's extensive emotional and drug history, Bruno's drug use at the time of the murder, Dr. Stillman's testimony that Bruno had organic brain damage as a result of his drug use, and testimony that Bruno had attempted suicide and was briefly hospitalized. This evidence was thoroughly discussed in this Court's previous opinion on direct appeal. See Bruno, 574 So.2d at 82-83. Counsel's performance in this case may not have been perfect, but it did not fall below the required standard. See Teffeteller v. Dugger, 734 So.2d 1009, 1022 n. 14 (Fla.1999) ("[T]he legal standard is reasonably effective counsel, not perfect or error-free counsel."). Moreover, counsel's performance cannot be considered deficient simply because the evidence presented during the 3.850 hearing may have been more detailed than the evidence presented at trial, especially in light of the fact that the substance of both presentations was essentially the same. Finally, even assuming that counsel's performance was deficient, we agree with the trial court that Bruno has failed to satisfy the second prong of the Strickland test, as Bruno has not established that there is a reasonable probability that such deficiency affected the sentence.
Finally, in subclaim eleven, Bruno alleges that counsel was negligent for the following reasons: (1) the jury was misinformed, without objection, as to its sentencing responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (2) counsel stipulated to the introduction of Bruno's prior convictions for marijuana and cocaine possession; (3) counsel failed to object to the state attorney's remarks regarding Bruno's tattoos, (4) counsel failed to object to the state attorney's argument that it could find the contemporaneous robbery as a prior violent felony; and (5) counsel failed to object to the state attorney's argument that the jury could count three aggravatorspecuniary gain, felony murder, and prior violent felonyas three separate aggravators or just one. The trial court incorrectly concluded that these claims were procedurally barred, as they were included in the direct appeal opinion's laundry list. Nevertheless, we conclude that Bruno has failed to show deficient performance or prejudice arising from the alleged errors, as required by Strickland.

III. BRUNO'S COMPETENCY
Bruno claims that counsel was ineffective in failing to provide Dr. Stillman with sufficient background information. Bruno argues that counsel's neglect prevented *69 Dr. Stillman from sufficiently assessing Bruno's competence to stand trial and potential mitigating circumstances.
Prior to trial, Dr. Stillman was appointed to evaluate whether Bruno was insane at the time of the offense or incompetent to stand trial. The record reveals that Dr. Stillman informed defense counsel on two separate occasions that he did not believe that Bruno was either insane at the time of the offense or incompetent to stand trial. Subsequently, Dr. Stillman was called as a defense witness during the penalty phase. In preparing for this testimony, Dr. Stillman interviewed, for the first time, members of Bruno's family and a jail nurse who had contact with Bruno. These meetings occurred within two days of Dr. Stillman's testimony. During the State's cross-examination, Dr. Stillman opined that he believed that Bruno was insane at the time of the offense. Dr. Stillman testified that despite his previous determinations that Bruno was not insane,[18] he still had a suspicion, and that this suspicion was confirmed upon meeting with members of Bruno's family and the nurse. Thereupon, during a break in the penalty phase, defense counsel explained to the trial court that Dr. Stillman's testimony was a complete surprise and contrary to the opinion that Dr. Stillman had previously given defense counsel. Prior to sentencing, defense counsel filed a motion for a psychiatric reevaluation, which was denied by the trial court.
The trial court below rejected this claim as follows:
Since Dr. Stillman is dead, there is no way for the court to ascertain what factors he considered, or did not consider, in the way of background material on the Defendant. The record of the trial reflects that Dr. Stillman interviewed the defendant twice for a total of two and a half hours. He read letters written to Jean Gruninger and he spoke with the defendant's sister and parents. The record reflects that Dr. Stillman was aware of the Defendant's extensive drug usage, and his stay at Pilgrim State hospital. The experts presented by the Defendant at the evidentiary hearing did not testify that they believed that the Defendant was incompetent to stand trial.... At the penalty phase, the jury and trial judge were presented with testimony relating to his drug usage, family background, and mental health. The fact that the defendant and his family withheld information from [counsel], or that a more detailed presentation of this evidence could have been made in hindsight, does not render [counsel's] performance deficient.
We agree. As far as Dr. Stillman's penalty phase testimony, it is clear from the record that Dr. Stillman had been provided with all necessary information at the time of his testimony. In regards to whether Bruno was competent to stand trial or insane at the time of the offense, we find no negligence on the part of defense counsel. Defense counsel asked Dr. Stillman to evaluate Bruno prior to trial. Dr. Stillman rendered an opinion, on two separate occasions, that Bruno was neither incompetent to stand trial nor insane at the time of the offense. Bruno has not established that Dr. Stillman told defense counsel that he needed more information in order to form this opinion. Counsel cannot be faulted simply because Dr. Stillman apparently changed his opinion after meeting with Bruno's family members, especially since it appears that Dr. Stillman failed to inform defense counsel of his new conclusion. Moreover, as pointed out by *70 the trial court below, Bruno failed to present any evidence in the evidentiary hearing below that he was either incompetent to stand trial or insane at the time of the offense. Hence, we find no merit to this claim.

IV. REMAINING ISSUES
In claim three, Bruno alleges that the penalty-phase instructions were unreasonably vague and confusing. The trial court properly ruled that this claim is procedurally barred, as it should have been raised on direct appeal. See Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). To the extent this claim relies on the Radelet study,[19] which was not available at the time of Bruno's trial, we find no merit to this evidence.
In his final claim, Bruno alleges that the numerous constitutional violations that occurred in this case warrant relief. All of Bruno's claims were either meritless or procedurally barred; therefore, there was no cumulative effect to consider. See Melendez v. State, 718 So.2d 746, 749 (Fla. 1998).

V. CONCLUSION
Based on the foregoing, we affirm the trial court's denial of Bruno's motion for postconviction relief.
It is so ordered.
WELLS, C.J., and HARDING, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which SHAW and PARIENTE, JJ., concur.
ANSTEAD, J., concurring in part and dissenting in part.
As noted in the majority opinion, Bruno asserts some ten instances in which he claims his trial attorney rendered ineffective assistance during the course of the trial.[20] While I agree with the majority's analysis and rejection of claims of error as to eight of these claims, it appears that two of Bruno's claims present valid instances of ineffectiveness. They include: (1) the improper and prejudicial disclosure of confidential information by counsel; and (2) counsel's critical failure to investigate and present mitigating evidence on behalf of the defendant to the sentencing jury and judge.

Disclosure of Confidential Information at Penalty Phase
Bruno argues that his trial counsel substantially prejudiced the outcome of his penalty phase proceedings when trial counsel divulged confidential and damaging information to the trial court by informing the court during the penalty phase that he was completely surprised by Dr. *71 Stillman's testimony that Bruno was "insane" at the time of the offense. After Stillman made the surprise disclosure that he believed Bruno was insane at the time of the crime, defense counsel approached both the court and the prosecutor and told them that Stillman had personally assured him many times just the opposite-that Bruno was "totally competent." Critically, the prosecutor later used this assurance during closing argument to completely impeach Stillman's testimony, and the sentencing court subsequently rejected Stillman's penalty phase testimony in toto. Bruno claims that his lawyer was ineffective because counsel's disclosures completely discredited Bruno's most important mitigation witness and his only expert witness, thereby conceding away virtually his entire case for mitigation.
At the postconviction evidentiary hearing, the trial court ruled that this claim was procedurally barred because a similar issue was addressed on direct appeal. This ruling is clearly erroneous since this issue is part of an ineffectiveness claim which we have consistently held cannot be legally raised on direct appeal.
On the merits, it appears that the lawyer was taken by complete surprise due to his own lack of preparation for the penalty phase, and he was so eager to assure the court and the prosecutor that he was not negligent that he sacrificed the welfare of a client on trial for his life. Through his lack of preparation and panic announcement to the trial court, he eliminated any reasonable chance that the judge or jury would find that any mitigation had been established through the expert's testimony. Indeed the trial court expressly rejected the expert's testimony and found that no mitigating circumstances had been established for the defendant.
The record reflects that trial counsel called Dr. Stillman, a psychiatrist appointed to evaluate Bruno, to testify about Bruno's mental state and drug usage. During direct examination, Stillman actually testified to the existence of some mitigation. According to Stillman, Bruno suffered from a passive-aggressive personality, and he also exhibited signs of a schizophrenic-type disorder when he was under the influence of drugs. For example, Stillman testified that Bruno's tattoos demonstrate the "utter confusion" in his thinking. Stillman testified that Bruno started using L.S.D. and marijuana when he was married and that his drug abuse progressively worsened over the years. When his wife left him, he tried to kill himself by taking Quaaludes and by attempting to drown himself in the ocean. Further, Stillman testified that Bruno had been using an ounce of cocaine every day for weeks prior to the offense.
However, during cross-examination, Stillman proclaimed for the first time that he believed Bruno was insane at the time of the murder. He claimed that at the prior times he had evaluated the defendant, he suspected that Bruno may have been insane at the time of the offense but the lack of corroborating evidence prevented him from reaching such a conclusion. Stillman testified that he received the corroborating evidence just a few days before trial, when he discussed Bruno with his parents and sister. He claimed that he had now changed his opinion after learning about Bruno's drug use from his younger sister, parents, and a nurse who worked with Bruno at the jail.
The trial transcript from the direct appeal explicitly reveals that trial counsel was taken by total surprise and was completely unprepared for Stillman's pronouncement that Bruno was insane. In an apparent panic, trial counsel reacted to Stillman's revelation by immediately disclosing to the court two confidential letters *72 to trial counsel in which Stillman had opined that Bruno was competent to stand trial and was not insane. Trial counsel told the court that he thought he was duty bound to bring this patent inconsistency in Stillman's evaluations to the trial court's attention.
At the evidentiary hearing in the 3.850 proceeding, trial counsel sought to justify his breach of confidence by claiming that he acted in order to justify his subsequent motion for an additional psychological examination. However, the record directly refutes this assertion. In the actual motion for psychiatric evaluation, which was filed after the jury's recommendation for death but prior to the trial court's sentencing, trial counsel made absolutely no reference to the fact that Stillman had changed his opinion concerning Bruno's sanity. Rather, the motion asserts Stillman's prior opinions (i.e., that Bruno was sane and competent), but alleges that members of Bruno's family now indicate that Bruno may not, in fact, be sane or competent to stand trial. Indeed, the motion alleges that trial counsel and Stillman were unaware of Bruno's psychological history until trial counsel talked with Bruno's sister and learned about Bruno's history of drug use, attempted suicide, and hospitalization for mental problems.
Thus, trial counsel's stated tactical reason for disclosing this obviously damaging and confidential information to the court is not supported by the record. Rather, trial counsel's reason for disclosing this confidential information appears to have been prompted more by counsel's interest in maintaining his own credibility with the court and demonstrating that he had not been negligent in failing to present an insanity defense during the guilt phase, than by an interest in securing a future psychiatric examination for his client.
In Douglas v. Wainwright, 714 F.2d 1532, 1557 (11th Cir.1983), vacated, 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), opinion reinstated by, 739 F.2d 531 (C.A.Fla.1984), the Eleventh Circuit noted that "[t]he most egregious examples of ineffectiveness do not always arise because of what counsel did not do, but from what he did door say." In Douglas, the Eleventh Circuit reasoned that counsel's deficient conduct undoubtedly prejudiced the defendant because based on counsel's comments during the penalty phase, the trial court concluded there was no mitigating evidence to present on the defendant's behalf. See id. at 1558. Similarly, in Blanco v. Singletary, 943 F.2d 1477, 1499-1500 (11th Cir.1991), the trial attorneys volunteered inappropriate information to the trial court concerning the fact that they did not have any mitigating evidence to present and that none of the defendant's friends or family members would agree to testify on his behalf. As in Douglas, the defense in Blanco did not present any mitigating evidence during the trial. Relying on Douglas, the Eleventh Circuit held that counsel's errors did not fall within the range of competent performance expected in criminal cases. See id. at 1500.
Unlike Blanco and Douglas, trial counsel in the instant case did present some mitigating evidence, namely Dr. Stillman and Bruno's parents. However, trial counsel's improper disclosure to the trial court that Stillman had earlier consistently opined that Bruno was sane highlighted a serious inconsistency in Stillman's professional opinion, which, when explored, completely undermined the expert's credibility to the jury and the court. As noted, the trial court specifically rejected Stillman's testimony. See Sentencing Order at 1106. The trial court stated in the order that it "considered the testimony of Dr. Stillman presented at the advisory phase, and makes a factual finding which rejects the *73 Doctor's opinions regarding the defendant being extremely mentally or emotionally disturbed."
The only other witnesses trial counsel presented were Bruno's parents, who provided marginal evidence of mitigation. At the close of all the evidence, the jury recommended death by a vote of eight to four and the court imposed death, finding no mitigating circumstances. Because the trial court in this case ultimately rejected Stillman's testimony and found no mitigating evidence, counsel's error in revealing damaging, confidential information to the trial court against his most important witness clearly affected the jury's and the trial court's evaluation of the evidence and the outcome of the case.

Failure to Investigate and Present Mitigating Evidence
Bruno further claims that counsel was manifestly ineffective in his more or less complete failure to investigate and present evidence of the abundant mitigating evidence that actually existed of Bruno's troubled history of mental problems and drug abuse.
The record reflects that the trial court allowed no break between the finding of guilt by the jury and the penalty phase of the trial; indeed, the penalty phase began the very next morning. Trial counsel acceded to this procedure. It is true that trial counsel presented some mitigating evidence. In addition to the evidence presented by Dr. Stillman, which was subsequently undermined by counsel's dramatic disclosure to the trial court and the prosecutor's impeachment, trial counsel also called Bruno's parents to testify. Bruno's mother described Bruno as he was as a young man, claiming that he was "good boy." However, she testified that after he left home and got married, he changed drastically. He started wearing his hair long (in a mohawk), tattooed his body, and started hanging around with a motorcycle group and bands. She testified that after his marriage ended he went "berserk," lost the desire to live and attempted to commit suicide by drowning himself and overdosing on drugs. She further testified that she was aware that Bruno used drugs.
Critically, however, at the end of her testimony, when trial counsel asked her whether she had anything to say to the jury about the possible punishment her son should receive, Bruno's mother declared: "All I can say is that I don't have much time, neither does my husband. But if that's your wish [i.e., the imposition of the punishment of death] and you think you are doing right, God bless you. But other than that I don't know what to say. I just feel sorry for my husband, but if a child does something wrong, he should be punished. That is my belief." Bruno's father testified about the same facts. However, unlike Bruno's mother, Bruno's father testified that he did not believe that Bruno deserved the death penalty.
As noted above, counsel was unprepared and taken completely by surprise by Dr. Stillman's statement that Bruno was insane at the time of the crime. However, instead of attempting to use Dr. Stillman's opinion to his client's benefit, counsel completely discredited Stillman to the court and prosecutor by telling them that Stillman had assured him all along that Bruno was sane. Although the prosecutor then totally impeached Stillman's testimony before the judge and jury, Bruno's counsel did nothing to rehabilitate his witness. Rather, he did the opposite by abandoning him and his opinions. Of course, had counsel done his job as a lawyer and spoken to Stillman prior to placing him on the stand, he obviously would have learned of Stillman's changed opinion and then would have been in a position to use it to his client's benefit.
*74 On direct examination during the penalty phase, counsel did not elicit a single affirmative opinion from Stillman concerning the applicability of mitigators to this crime.[21] Counsel was apparently unaware of his obligation to do so. Importantly, the record reflects that Dr. Stillman was appointed by the court only to assess Bruno's sanity and competency for guilt phase purposes, and not to evaluate Bruno and his background to determine the existence of mitigation for penalty phase purposes. He interviewed Bruno before the guilt phase on two occasions for a total of two and one-half hours. However, he admitted that he knew very little of Bruno's mental health history until just hours before he actually testified at the penalty phase. Counsel never sought a mental health evaluation of his client for mitigation purposes, an evaluation that is fundamental in defending against the death penalty.
Further, the record reflects that although trial counsel presented Bruno's parents and Dr. Stillman as witnesses at the penalty phase, counsel did nothing to prepare these witnesses for testifying and, most tellingly, was unaware of the content of their testimony beforehand, especially regarding the opinion of Bruno's mother that he must accept his punishment. Bruno's mother testified below that counsel did nothing to prepare her and her husband for testifying at trial. At the time of the penalty phase, counsel did not even know who comprised the members of Bruno's immediate family-he did not know of the existence of Bruno's younger sister, who held key mental health information concerning him. Defense attorney Stella testified below that he used the defense investigator, Sydney Patrick, to prepare for the penalty phase. However, Patrick testified at the postconviction hearing that he did no work on the penalty phase.
The postconviction record reveals that copious mitigation actually existed in this case, which stands in stark and dramatic contrast to the meager presentation of counsel at the penalty phase and the finding of no mitigation by the sentencing judge. The record reflects that years before this crime Bruno had attempted suicide and had subsequently been hospitalized for psychiatric reasons. The record also demonstrates that Bruno has a lifelong and extensive record of drug abuse beginning with sniffing glue and lacquer thinner at ages eleven to thirteen.
At the postconviction evidentiary hearing, Bruno called two doctors, Dr. Dee, a neuropsychologist, and Dr. Lipman, a neuropharmacologist. Dr. Dee testified that Bruno suffers from organic brain syndrome as a result of his continuous, heavy, chronic drug use, which included cocaine, LSD, and marijuana. The most significant injury to his brain is manifested by impaired memory, increased impulsivity, difficulty in impulse control, deteriorated work performance, and inability to hold a job. According to Dr. Dee, at the time of the murder, Bruno was under the influence of extreme mental or emotional disturbance due to cerebral damage and drug usage.
Dr. Dee testified that according to Bruno's son Michael, on the day of the murder, Bruno free-based cocaine mid-day and used it continuously throughout the day until he and his son left for the victim's *75 apartment. Bruno had also taken three purple micro-dots of LSD and eight or nine Quaaludes. Dr. Dee also testified that Bruno's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired, also due to his cerebral impairment and intoxication. As for nonstatutory mitigation, Dr. Dee testified that Bruno and his siblings were physically beaten and abused by their mother as young children. This finding, based on accounts from Bruno's family members, differ significantly from Bruno's mother's testimony during the penalty phase proceedings that Bruno grew up in a happy home.
Dr. Lipman traced Bruno's history of drug use, suicide attempts, and hospitalization. He also concurred with Dr. Dee's conclusion that at the time of the offense, Bruno was under the influence of extreme mental or emotional disturbance. Similar to Dr. Dee, Dr. Lipman based his conclusion on the effect that years of chronic drug usage would have had on Bruno's brain. He also concluded that based on Bruno's use of LSD, cocaine, and Quaaludes, he was not capable of appreciating the criminality of his conduct or conforming his conduct to the requirements of the law at the time of the offense.
While this testimony is somewhat similar to the testimony presented at the trial as to Bruno's drug usage, it is dramatically different in several respects. First, the postconviction experts testified in detail about the existence of two statutory mitigating factors and several nonstatutory factors, including Bruno's chronic drug use, child abuse, and organic brain damage. Second, the experts gave consistent opinions about Bruno, unlike Dr. Stillman, who rendered an opinion directly inconsistent with his prior opinion. Third, the postconviction testimony that was presented is much more detailed than what was presented at the penalty phase. As noted above, Bruno's mother's testimony at the penalty phase was actually more damaging than helpful because she essentially told the jury that her son deserved to be punished by death if he committed the crime. Thus, the testimony presented at the evidentiary hearing was substantially more favorable to Bruno both in quality and quantity.
Further, counsel's complete failure to present any credible mitigation was pounced on by the State during its closing argument. The State argued:
Let me go through the mitigating circumstances first, the things that are supposed to be in favor of the defendant. The first one is the defendant has no significant history of prior criminal activity. Of course, he has been found guilty of possession of cocaine, he has been found guilty of possession of marijuana, and he has admitted apparently to an on-going series of drug deals. Sounds like significant criminal activity to me. You can give it what weight you want, but he's been around.
Number two, the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance. I assume that's what Doctor Stillman was trying to testify to. I don't think you should give Doctor Stillman's testimony much weight. First of all, the practice of psychiatry is often no more than a little guess. Its like a blind man in a dark room looking for a brown hat which isn't there.

Doctor Stillman is an interesting man. Frankly he doesn't know what he is talking about. He simply doesn't know what he is talking about. All of a sudden at the time of sentence he runs in and says the defendant was insane at *76 the time of the offense. He's wrong. He simply never came to this conclusion. You know that he never came to that conclusion. We have to give Mr. Stella more credit than this, to let that defense pass by.

They simply had no defense. If they had had an insanity defense, Doctor Stillman would have appeared before this. Doctor Stillman simply doesn't know what he's talking about, he simply doesn't.
. . . .

I do not believe that there is anything in the circumstances of this offense or his character that are in his favor. There are essentially no mitigating factors. I really see none of any consequence there.

Record on Appeal at 886-87, Bruno v. State, 574 So.2d 76 (Fla.1991) (No. 71,419) (emphasis added). The record reflects that trial counsel did not object to the prosecutor's characterization of the field of psychiatry or to the prosecutor's comment that the defense would have called Stillman sooner if there was any truth to the insanity defense or to the prosecutor's stated belief as to the sufficiency of the mitigation evidence. Again, had counsel properly interviewed Stillman prior to placing him on the stand at the penalty phase, he would not have been taken by complete surprise and stood by while the State demolished the witness. Based on the dramatic events during the penalty phase proceeding, it is not surprising that the trial court found no mitigation.
Based on trial counsel's lack of preparation, the serious error in the trial court regarding the surprise revelation that Stillman had changed his opinion midstream, and the extent of evidence presented at the postconviction evidentiary hearing, it appears that Bruno has clearly demonstrated deficient performance by his counsel which prejudiced the outcome of the penalty phase of the proceedings. As noted above, the trial court found no mitigation, and it appears that counsel's lack of preparation, especially as regards the surprise testimony of Dr. Stillman, and the harmful testimony of Bruno's mother, seriously impaired the defendant's case for mitigation. Further, the record shows that the jury recommended death by a vote of eight to four, four votes for life even without the substantial mitigation we now know existed all the time. In the words of the United States Supreme Court in Strickland, it is apparent that confidence in the outcome of Bruno's penalty phase proceeding has been substantially undermined by counsel's neglect and lack of preparation.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] See Bruno v. State, 574 So.2d 76 (Fla.1991).
[2] The Court affirmed the following aggravating circumstances: (1) The murder was committed during a robbery and for pecuniary gain; (2) the murder was committed in a cold, calculated, and premeditated manner; and (3) the murder was heinous, atrocious, or cruel.
[3] Bruno raised the following claims in his 3.850 motion: (1) Bruno was denied his right to counsel because of trial counsel's grossly negligent or intentional conduct, or because of an act of God, in the destruction of the case file in this matter; (2) Bruno was denied access to the files and records pertaining to his case; (3) Bruno's counsel labored under an irreconcilable conflict of interest when he revealed confidential information to the court and the State; (4) Bruno was denied effective assistance of counsel during the guilt phase of his trial; (5) Bruno's son, Mike Bruno, Jr., was incompetent to testify; (6) the State presented false testimony and failed to disclose exculpatory information; (7) the State violated the rule of sequestration of witnesses; (8) Bruno was denied effective assistance of counsel during the penalty phase of his trial; (9) Bruno was denied a competent mental health examination and counsel was ineffective for failing to investigate and arrange such an examination; (10) the State failed to disclose an incriminating statement made by Bruno to Diane Liu regarding a "killing party" and related testimony and affirmatively misled the defense into believing such a statement did not exist; (11) the jury instructions at the penalty phase were unreasonably vague and confusing, and as a result, the instructions created a presumption in favor of death and the jurors' discretion was not suitably guided; and (12) the cumulative impact of error denied Bruno of his right to a fair trial.
[4] Bruno called the following witnesses: defense counsel; Professor Radelet (a sociology professor); Dr. Dee (a neuropsychologist); Arthur Maheu (Arthur is the husband of Sharon Spalding; Sharon testified at trial that she saw Bruno with a gun on the morning of the killing); Dr. Lipman (a neuropharmacologist); and Elizabeth Bruno (the defendant's mother).
[5] The State in rebuttal called Sydney Patrick (the defense investigator hired by defense counsel).
[6] Bruno raises the following issues: (1) ineffective assistance of counsel during the guilt and penalty phases of the trial; (2) incompetent mental health exam; (3) unconstitutionally vague penalty phase instructions; and (4) cumulative error.
[7] The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), set forth the following criteria for evaluating an ineffectiveness claim:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Id. at 687, 104 S.Ct. 2052. The Supreme Court further expounded on the second prong, i.e., the prejudice prong, of this standard:
The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
Id. at 694, 104 S.Ct. 2052.
[8] See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999) ("Thus, under Strickland, both the performance and prejudice prongs are mixed questions of law and fact [and subject to de novo review], with deference to be given only to the lower court's factual findings.").
[9] Bruno raises the following ten subclaims regarding ineffective assistance of counsel: defense counsel was impaired during the time that he represented Bruno; defense counsel had a conflict of interest with Bruno; defense counsel failed to present a voluntary intoxication defense; defense counsel failed to seek suppression of Bruno's initial statement to the police; defense counsel failed to attack Bruno's confession on intoxication grounds; defense counsel failed to effectively challenge the State's case; defense counsel failed to object to the instructions on excusable homicide and justifiable homicide; defense counsel failed to ensure that the jury challenges were recorded; defense counsel failed to investigate and present available mitigation; and defense counsel failed to object to the State's improper comments.
[10] The numbers of the subclaims in this opinion mirror the numbers in Bruno's brief. Subclaim one is not addressed, as it is simply an introduction to the other subclaims.
[11] See, e.g., Tyson v. Aikman, 159 Fla. 273, 31 So.2d 272, 273 (1947) ("An appeal is to consider errors alleged to have been committed by the ... trial judge."); M.F.S. Land Co. v. J. Ray Arnold Cypress Co., 103 Fla. 732, 139 So. 200, 201 (1931) ("[T]he purpose of an appeal is to correct a harmful error which the [trial court] may have committed.").
[12] See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[13] See Fla. R.Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."); see, e.g., Maharaj v. State, 684 So.2d 726, 728 (Fla.1996) ("It does appear that a substantial number of Maharaj's claims may properly be denied without an evidentiary hearing because they were either raised or could have been raised on direct appeal and, consequently, cannot be relitigated in postconviction relief proceeding.").
[14] See, e.g., Wuornos v. State, 676 So.2d 972, 974 (Fla.1996) ("We find that this argument constitutes a claim of ineffective assistance of counsel not cognizable on direct appeal, but only by collateral challenge."); Kelley v. State, 486 So.2d 578, 585 (Fla.1986) ("Generally, such claims [of ineffectiveness] are not reviewable on direct appeal but are more properly raised in a motion for postconviction relief."). A claim of ineffectiveness can properly be raised on direct appeal only if the record on its face demonstrates ineffectiveness. See Wuornos, 676 So.2d at 974.
[15] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[16] Although the trial court stated that "there is no reasonable probability that the verdict would have been different, had Bruno's initial exculpatory statements been received in evidence," it is clear from the arguments made and the language of the entire order that the trial court simply made a typographical error and left out the word "not" between the words "statements" and "been."
[17] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
[18] The record indicates that prior to the guilt phase of the trial, defense counsel received two letters from Dr. Stillman, wherein Dr. Stillman opined that Bruno was not insane at the time of the offense or incompetent to stand trial.
[19] Dr. Michael Radelet, the chair of the Sociology Department at the University of Florida, conducted a study concerning a jury's understanding of the penalty phase instructions in a capital case. At the evidentiary hearing below, Dr. Radelet testified regarding the results of the study. He concluded that "jurors have great misunderstandings of the instructions read at the penalty phase of capital trials."
[20] The claimed instances of ineffectiveness are: (1) defense counsel's impairment during the time he represented Bruno; (2) conflict of interest; (3) failure to present a voluntary intoxication defense; (4) failure to move to suppress Bruno's initial statement to the police; (5) failure to attack Bruno's confession on intoxication grounds; (6) failure to challenge the State's case; (7) failure to object to instructions on excusable and justifiable homicide; (8) failure to ensure that jury challenges were recorded; (9) failure to investigate and present mitigating evidence; and (10) failure to object to the State's improper comments.
[21] Although Dr. Stillman did not specifically mention any mitigating circumstances that applied, trial counsel argued to the jury that the evidence supported several mitigators. These mitigators included: (1) Bruno was under extreme mental or emotional disturbance at the time of the offense, and (2) he was incapable of fully appreciating the criminality of his actions. Trial counsel also argued that Bruno's history of drug abuse was a valid mitigating factor to consider.