# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D2023-1319
Lower Tribunal No. 2012-CF-001864-A-O

_____

NIMA MORADI,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

Appeal from the Circuit Court for Orange County.
Julie H. O'Kane and Wayne C. Wooten, Judges.

January 10, 2025

## ON MOTION FOR REHEARING AND WRITTEN OPINION

We grant in part the motion for rehearing and written opinion filed by Appellant, Nima Moradi, withdraw our prior per curiam affirmance, and substitute this opinion in its place. We will not entertain a subsequent motion for rehearing except on the postconviction ground raised in Moradi's motion for rehearing and written opinion and addressed here.

TRAVER, C.J.

Nima Moradi appeals the postconviction court's denial of his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.[1] Moradi raised six grounds for relief, and we affirm five without further discussion. On the sixth ground, the postconviction court correctly concluded Moradi suffered no *Strickland*[2] prejudice when trial counsel failed to object to a justifiable use of deadly force instruction. Moradi cannot demonstrate a reasonable probability that the result of his trial would have been different had counsel submitted a proper instruction. We thus affirm.

## I.    Background

In 2012, the State charged Moradi with first-degree murder, carjacking, and kidnapping. Following his unsuccessful attempt to dismiss the indictment under Florida's Stand Your Ground law, the case proceeded to trial in 2015. The State theorized that Moradi lured Richard Luyo to his home intending to rob Luyo, a plan that ended in Luyo's murder. Moradi focused on self-defense, insisting that he stabbed Luyo five times to protect himself from a knife attack.

---

[1] This case was transferred from the Fifth District Court of Appeal to this Court on January 1, 2023.

[2] *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

2

Moradi was the only eyewitness to the first part of the encounter because Luyo died before he could make a statement. At the time of the charged offenses, Moradi was twenty-one years old. He was an unemployed community college student who lived at home with his parents and younger sister. Moradi testified that his parents upgraded the family's phones for Christmas, and he asked if he could sell the old ones. His parents agreed, and his mother also gave him another phone to sell that she had purchased from her boss. Moradi responded to Luyo's online advertisement, and the two began texting, eventually negotiating a purchase price.

Luyo was a stay-at-home dad who had a side business buying, restoring, and selling old phones. Luyo wanted to meet Moradi in a public place, but Moradi said he could not drive because he had a suspended license. Moradi admitted that his license was not suspended, but he claimed that he was embarrassed to tell Luyo that his father forbade him from taking the family car out on weekdays except for college-related purposes. But Moradi later admitted he could have met Luyo at the library. Ultimately, though, Luyo offered to drive to Moradi's home.

Luyo parked on the street, with his car facing towards the subdivision's exit. He left his five-year-old son in the car's back seat while he went into Moradi's home. Luyo wore a t-shirt that said "Abercrombie Warrior." Moradi noticed that Luyo had an athletic build, and that he walked like he played sports. He also noticed that Luyo

appeared Asian, and Moradi assumed this meant Luyo knew martial arts. He did not. Luyo followed Moradi through his garage and into his house.

Moradi reported that he presented the four phones to Luyo at the kitchen counter. Luyo took the phones out of their boxes to inspect them. He unlocked three phones but the fourth phone was locked. According to Moradi, Luyo already seemed agitated, and the locked phone caused him further consternation. When Moradi refused to reduce the negotiated price, Luyo—who was 5'7" and weighed 140 pounds—walked around the kitchen counter and shoved him. Luyo then punched Moradi—who is 6'3" and weighed 200 pounds—in the face. Moradi said that he fled the kitchen because he wanted to get Luyo out of the house before his mother and sister came home. He thus retreated down the hallway leading to the garage. He testified that Luyo jumped on his back, clinging to his neck with one arm and punching him with the other. They spilled over a small step and fell into the garage, where they separated.

Moradi said that Luyo looked to the top of a five-foot-tall white refrigerator, where amid clutter, Luyo saw a white-handled steak knife with a five-inch blade and a five-inch handle. According to Moradi, Luyo grabbed the knife and approached Moradi in a way that—coupled with Luyo's ethnicity—gave Moradi concern Luyo knew how to handle himself in a knife fight. Moradi said that Luyo lunged at him with the knife in his right hand, and Moradi dodged. Moradi then grabbed Luyo's

4

right arm with his left hand, and the two locked up like football players. Moradi testified Luyo poked his kneecap with the tip of the knife. He declared that it felt like "a bolt of lightning" and caused him excruciating pain.

Moradi testified that he then wrested the knife from Luyo, cutting Luyo's hand. But Luyo "came right" at him, and he delivered three to four "quick jabs" aimed downwards towards Luyo with the knife. Moradi alternatively testified to the "quick jabs" as "pokes." A medical examiner testified that one of these "quick jabs" or "pokes" went six and three-quarters inches into Luyo's chest, piercing his heart. Moradi explained that the knife was very sharp, and this was why a "quick jab" or "poke" with a five-inch blade caused a near-seven-inch fatal chest wound. The medical examiner disagreed, stating that Moradi needed to stab Luyo with a forceful motion to compress Luyo's chest muscles the necessary two and three-quarters inches to create this injury.

Luyo had four other stab wounds, and including the injuries to his hand, three other knife injuries. The second stab wound superficially cut Luyo's neck; he also had abrasions on his neck consistent with a slash wound. A third pierced the back of his left arm, penetrating four-and-a-half inches into his shoulder muscles. A fourth went two-and-a-quarter inches into his chest, nicking an artery and causing a second fatal injury. Luyo also had a slice wound on the front of his left arm.

After causing these injuries, Moradi threw the knife away, in his words, to "get it out of the equation." Law enforcement would later find the bloody knife at the entry to the garage, which meant Moradi would have thrown it between Luyo and Luyo's car. Moradi theorized that the knife must have ricocheted off something in the garage and landed there. Moradi said that at that time, Luyo did not seem to be injured, had no blood on him, and "was still fighting pretty hard." Subsequent forensic testing would show only Luyo's blood in the garage. But laboratory tests did show Luyo's touch DNA on the knife's handle.

Multiple witnesses saw what happened next. Moradi's neighbor was driving past when she saw Luyo struggling to break free from Moradi's grasp outside the garage. Luyo escaped by slipping out of his shirt. Luyo then ran towards the neighbor's car while hollering "Help me, he's going to kill me!" The neighbor could see that Luyo had been stabbed and was bleeding. He left bloody handprints on her car while banging on her window. She called 911 as he ran away from her car and towards his.

At this point, the neighbor saw Moradi—who had been watching from the garage's entry—spring into action. As Luyo got into his car and started it, Moradi ran to the car and jumped into the car's back seat next to Luyo's son. He did not limp, and he showed no signs of injury. Moradi admitted that he knew Luyo was no longer a threat to him. But the neighbor watched Moradi and Luyo fight for control

6

of the car. Moradi explained that he wanted to hold Luyo at the scene to answer for his actions in the kitchen and garage.

Luyo drove his car towards the subdivision's exit. Three house painters returning to work in the neighborhood drove towards him. The neighbor and house painters all witnessed Luyo's car stop. Luyo fell out of it, with his legs still inside. Moradi jumped on top of Luyo and hit him. He also placed his hands around Luyo's neck; the neighbor said Moradi was choking him. One painter described the scene as "the littler guy was basically defenseless, and he was just getting beat, like, nonstop. And he was defenseless, and all you see is blood pumping out of his arm. It was like a main artery or something." The second painter said Moradi was "beating the snot out of [Luyo]." The third painter told Moradi to get off Luyo after witnessing Moradi punch Luyo twice. Nobody saw Luyo fight back. All three painters heard Luyo say, "He's trying to kill me." The third painter heard both Moradi and Luyo say this. A picture admitted into evidence showed Luyo's blood sprayed and pooled all over the street, and not just beneath the locations of his stab wounds.

Moradi got back into Luyo's car and started driving away with the door open. According to Moradi, he was trying to leave because he did not want Luyo alone on the street when his mother came home from work. He also claimed that both he and Luyo were sitting in the front seat at the same time, and Luyo put the car into drive.

7

By contrast, multiple witnesses watched Luyo grab the window or the steering wheel of the car as Moradi drove away, dragging him down the street before crashing into an electrical pole.

Moradi did not recall dragging Luyo; he said they were both in the car's front seat at the same time. But the medical examiner noted that Luyo had abrasions to his knees and left shin consistent with being dragged. When Moradi hit the electrical pole, he said he realized for the first time that Luyo was "badly hurt." Moradi also testified—at odds with his earlier "bolt of lightning" statement—that he first noticed his knee was hurt when the car crashed. The neighbor witnessed Moradi exit the car, step on Luyo, and limp away.

During this time, Moradi's sister and her best friend drove up. The best friend testified that she had to swerve to miss Luyo's car, which Moradi drove "abnormally quickly" while it dragged Luyo down the road. Moradi then got out of the car and had a brief conversation with his sister and her best friend; he said that it was to alert them of the child's presence in the car's back seat. He did not tell them that Luyo had stabbed him in the knee or that he had stabbed Luyo five times. He then grabbed the best friend's keys and drove back to the house.

At the house, Moradi took the keys to the family car, his wallet, his phone, and the four phones and their boxes from the kitchen counter. He did not have his shoes or his glasses, and he ran over the family's bicycles while backing out of the

8

driveway. He sped past the painters, his neighbor, his sister, and her best friend, Luyo's car, and Luyo's body on the way out of the neighborhood. Moradi's sister and her best friend went to the house and started cleaning up blood from the garage.

Moradi drove the family car two to three miles away, where he called a friend who had an affiliation with a local street gang. She pulled up, and he approached from a nearby home where he had been washing blood off himself using a garden hose. He was limping and covered in blood. She first told law enforcement officers that Moradi would not give her a straight answer why he stabbed Luyo. But at trial, she testified that Moradi told her he had been stabbed and showed her his knee injury. She also recounted that Moradi said he stabbed someone, and there was a child involved. From the friend's car, Moradi called the lawyer who would ultimately first chair his trial. But he told his friend that he did not want to be found.

First responders rushed Luyo to the hospital, where doctors transfused eighteen units of blood into him (the medical examiner testified the typical male has ten units of blood). They tried to sew up the cut to Luyo's heart, but by the time they did, it had started necrosing. They also had to "keep going back and operating until they could find" the second stab wound that cut Luyo's artery. He died that night.

Meanwhile, Moradi's friend took him to an apartment rented by a street gang, where he cleaned himself up. She also got him new clothes, new shoes, and a bus

ticket to Tallahassee under an assumed name. She claimed Moradi threw away his clothes in the apartment dumpster; Moradi testified that the friend took his clothes. On the day of the stabbing, Moradi repeatedly spoke to his lawyer about turning himself in. But Moradi never contacted or surrendered to authorities. Instead, the United States Marshals arrested him in Tallahassee eight days later. He had no injuries. He testified that he gave the family's phones to a friend to sell before his arrest.

After an abbreviated charge conference, the trial court instructed the jury on the justifiable use of deadly force using an agreed-upon standard instruction. The instruction correctly informed the jury that Moradi's use of deadly force on Luyo was justifiable if the jury found Moradi had been resisting an attempt to commit aggravated battery or aggravated assault upon him. But instead of just stating the elements of aggravated battery or aggravated assault, the instruction improperly informed the jury that the State needed to prove them beyond a reasonable doubt.[3]

---

[3] The operative portions of the instructions stated:

> To prove the crime of Aggravated Battery, the State must prove the following two elements beyond a reasonable doubt. The first element is a definition of battery.
> 1. Richard Luyo intentionally caused bodily harm to Nima Nash Moradi.
> 2. Richard Luyo in committing the battery used a deadly weapon.
> . . . .

10

Trial counsel did not object to this instruction at the charge conference or after the trial court delivered it.

The jury found Moradi guilty of the lesser-included offenses of second-degree murder of Luyo and false imprisonment of his son; it returned an as-charged verdict for carjacking Luyo. The trial court sentenced Moradi to thirty years in prison. The Fifth District affirmed his direct appeal without opinion. *Moradi v. State*, 234 So. 3d 765 (Fla. 5th DCA 2017).

Moradi then moved for postconviction relief, asserting that his counsel had been ineffective for failing to object to the self-defense instruction. The postconviction court set the matter for an evidentiary hearing. At the hearing, Moradi's lead trial counsel, a criminal defense specialist with over thirty years of experience, testified that he delegated jury instruction preparation and the handling of the charge conference to his co-counsel. At the time of trial, co-counsel had been

---

To prove the crime of Aggravated Assault, the State must prove the following four elements beyond a reasonable doubt. The first three elements define assault.
1. Richard Luyo intentionally and unlawfully threatened, either by word or by act, to do violence to Nima Nash Moradi.
2. At the time, Richard Luyo appeared to have the ability to carry out the threat.
3. The act of Richard Luyo created in the mind of Nima Nash Moradi a well-founded fear that the violence was about to take place.

11

an attorney for "several decades," but at the time of the hearing, he worked as a paralegal because he resigned his license for trust account violations following an agreement with The Florida Bar.[4]

Co-counsel did not recall doing any independent research on the justifiable use of deadly force before trial. Instead, he relied on the standard jury instruction. He did not notice any errors in the final written instructions, and he did not notice any errors when the trial court read them to the jury. He testified, though, that if he had noticed the justifiable use of deadly force instruction placed the burden on the State to prove Luyo committed aggravated assault or battery on Moradi, he would have "made some sort of objection or comment."

Both Moradi's lawyers testified they were unfamiliar with a four-year-old case—binding at the time—that held it was fundamental error to deliver a justifiable use of deadly force instruction that referred to a burden when discussing the forcible felony that can be used to establish a self-defense claim. *See Montijo v. State*, 61 So. 3d 424, 427 (Fla. 5th DCA 2011).[5] The *Montijo* court reasoned that even though

_____

[4] The Florida Supreme Court would later disbar him. *See Fla. Bar v. Brodersen*, No. SC2022-1691, 2024 WL 3519614, at *1 (Fla. July 24, 2024).

[5] *See also* § 776.012(2), Fla. Stat. (2012) ("[A] person is justified in the use of deadly force and does not have a duty to retreat if: (1) [h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony; or (2) [u]nder those circumstances permitted pursuant to s. 776.013."); § 776.013(3), Fla. Stat. (2012) ("A person who is not engaged in an unlawful activity

the jury instruction[6] did not say whose burden it was, the jury would have understood it was the defendant's.  61 So. 3d at 426.  A year after Moradi's trial, the Florida Supreme Court approved revised jury instructions for justifiable use of deadly force, directing the omission of any reference to the burden of proof related to the forcible felony the victim was allegedly committing or about to commit.  *See In re Std. Jury Instr. in Crim. Cases—Report No. 2014–06*, 191 So. 3d 411, 414 (Fla. 2016) (citing *Montijo*, 61 So. 3d 424).

The postconviction court denied Moradi's motion after the hearing.[7] Although it noted that the justifiable use of deadly force instruction was "defective," the postconviction court's opinion did not address whether Moradi's attorneys

and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony."); § 776.031, Fla. Stat. (2012) ("A person is justified in the use of deadly force only if he or she reasonably believes that such force is necessary to prevent the imminent commission of a forcible felony.  A person does not have the duty to retreat if the person is in a place where he or she has a right to be."); § 782.02, Fla. Stat. (2015) ("The use of deadly force is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or her or upon or in any dwelling house in which such person shall be.").

[6] The operative part of the *Montijo* instruction stated: "To prove the crime of Aggravated Battery, two elements must be proven beyond a reasonable doubt."  61 So. 3d at 425 (emphasis omitted).

[7] Neither the postconviction judge who granted the evidentiary hearing nor the successor postconviction judge who denied Moradi's motion presided over his trial.

performed in a deficient manner. Instead, it concluded that Moradi suffered no prejudice. It reasoned that Moradi's self-defense claims were "thoroughly refuted by the evidence" and the case against him was "strong." It also declared that the evidence of Moradi's guilt was "overwhelming." Moradi appealed.

## II.    Legal Standard

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Amend. VI, U.S. Const. This "fundamental right" applies to Florida through the Fourteenth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963). "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland*, 466 U.S. at 685 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942)). "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (citations omitted).

The *Strickland* Court noted that "[t]he purpose [of the effective assistance guarantee of the Sixth Amendment] is simply to ensure that criminal defendants receive a fair trial." 466 U.S. at 689. Claims of ineffective assistance of counsel, however, are "extraordinary," and criminal defendants should make them "only

14

when the facts warrant it." *Downs v. State*, 453 So. 2d 1102, 1107 (Fla. 1984). *Downs* emphasized that these claims are not "appropriate in every case," and "[i]t should be the exception rather than the rule." *Id*.

To prevail on his ineffective assistance of counsel claim, Moradi must first show that his lawyers' performance was deficient. *See Strickland*, 466 U.S. at 687. He must then prove that the deficient performance prejudiced his defense. *See id*. "Unless [Moradi] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *See id*.

Our standard of review "also is two-pronged." *See Bruno v. State*, 807 So. 2d 55, 61–62 (Fla. 2001). We defer to the postconviction court's factual findings, but we review de novo its ultimate conclusions on deficient performance and prejudice. *See id*.

### III. Analysis

The postconviction court correctly ruled that Moradi suffered no prejudice from trial counsel's "defective" justifiable use of deadly force jury instruction.[8]

---

[8] We need not consider *Strickland*'s deficiency prong if Moradi cannot demonstrate prejudice. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will so often be, that course should be followed.").

While the postconviction court included an inappropriate discussion of fundamental error, which has no relevance to a postconviction prejudice analysis, it ultimately applied the appropriate legal standard. Our thorough review of this vast record and lengthy trial transcript reveals that there is no reasonable probability that, but for counsel's failure to object to the erroneous jury instruction, the result of the proceeding would have been different. Finally, this case is distinguishable, both factually and legally, from *Routenberg v. State*, 301 So. 3d 325 (Fla. 2d DCA 2020), a Second District decision addressing ineffective assistance of appellate counsel.

### A. The Prejudice Standard

The postconviction court ultimately applied the correct legal standard in determining Moradi suffered no prejudice. But Moradi contends that the postconviction court inappropriately discussed the fundamental error standard, which is inapplicable to postconviction proceedings. We agree, but this does not affect our ultimate determination.

To establish *Strickland* prejudice, Moradi must prove that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." 466 U.S. at 687. To make this showing, Moradi "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of this proceeding would have been different." *See id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In a challenge

16

to a criminal conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

The *Strickland* Court emphasized that in evaluating prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. But the distinction between the *Strickland* prejudice standard and the preponderance of the evidence standard is "slight and matters 'only in the rarest case.'" *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 693). Important here, it is not enough for Moradi to show that his lawyers' errors "had some conceivable effect" on his trial's outcome. *See Strickland*, 466 U.S. at 692. Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

While the postconviction court's order illustrates that it understood this standard, portions of the order discussed fundamental error.[9] This discussion had no place because "ineffective assistance of trial counsel claims under *Strickland* afford criminal defendants an easier path to relief than claims of fundamental error." *Steiger v. State*, 328 So. 3d 926, 930 (Fla. 2021). Fundamental error arises in direct appeals when trial counsel fails to make a timely objection to an error. *See Brown*

---

[9] The State may have contributed to this error by importing much of its answer brief in Moradi's direct appeal into its response to his postconviction motion.

17

*v. State*, 124 So. 2d 481, 484 (Fla. 1960). Unlike typical errors requiring a preserved objection, an appellant can raise fundamental error for the first time on appeal because "the error [reaches] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without [it]." *Id*.

Thus, the postconviction court's reference to Florida Supreme Court precedent discussing fundamental error in the context of improper justifiable use of deadly force instructions was misplaced. *See Martinez v. State*, 981 So. 2d 449, 455 (Fla. 2008). The *Martinez* Court held that fundamental error did not occur when a trial court delivered an unobjected-to jury instruction that negated a defendant's self-defense case. *Id*. at 455–56. It reasoned that self-defense was not the defendant's only defense, and his "claim of self-defense was extremely weak." *Id*. at 456. This particularized fundamental error standard has no direct application to a *Strickland* prejudice determination. At any rate, the postconviction court ultimately held that Moradi suffered no *Strickland* prejudice, and its correct application of the appropriate legal standard is all that is relevant here. In other words, our decision does not apply to challenges raised in the direct appeal of a criminal conviction involving a defective justifiable use of deadly force instruction.

B.    *Moradi's Self-Defense Case*

Applying the *Strickland* prejudice standard shows there is no reasonable probability that Moradi's verdict would have been different even if his trial counsel

18

had submitted the appropriate justifiable use of deadly force instruction. Two key legal principles shape our analysis. First, in evaluating whether Moradi suffered prejudice, we consider "all the evidence—the good and the bad." *See Wong v. Belmontes*, 558 U.S. 15, 26 (2009). "[A] verdict or conclusion only weakly supported by the record is more likely to be affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Second, we presume that the judge and the jury acted according to the law. *See id*. at 694; *Downs*, 453 So. 2d at 1109. Relatedly, and absent a contrary finding, "juries are presumed to follow the instructions given them." *Carter v. Brown & Williamson Tobacco Corp*., 778 So. 2d 932, 942 (Fla. 2000). While it might be tempting—given trial counsel's trial-long focus on self-defense and a standard instruction that informed the jury that Moradi did not have to prove anything—to speculate the jury knew they were deliberating on self-defense, we assume they followed the trial court's instructions to the letter. And these instructions legally negated Moradi's self-defense argument.

But it does not matter, because even under the lower *Strickland* prejudice standard, he cannot establish a basis for relief. Before analyzing all the evidence, we first note that neither party's brief contained a complete and accurate statement of what occurred at trial. Our determination is extremely fact-dependent, and the background section of this opinion reflects it. Even though we may decline to highlight a fact in our analysis, we have considered it in reaching our determination.

19

We concede Moradi offered the only eyewitness account of what happened before Luyo ran shirtless, hollering, and bleeding from Moradi's garage. But that is far from the only record evidence illustrating their initial confrontation. The forensic evidence against Moradi is damning, most particularly the number and force of the stab wounds he inflicted on Luyo. Moradi also admitted that he caused a smaller number of knife wounds than Luyo suffered but diminished the force he used to inflict them. A near-seven-inch, heart-piercing stab with a five-inch blade is not a "poke." Still, Moradi's self-defense case would have been far stronger—perhaps strong enough to show *Strickland* prejudice—if his encounter with Luyo ended in his garage. To be sure, Luyo's touch DNA was on the knife's handle. But the encounter did not end in the garage, and Luyo would suffer greatly for that.

Luyo parked his car on the street. It was not on Moradi's property, and when Luyo tried to leave, Moradi testified that he knew Luyo was no longer a threat to him. He had no legal basis to use force, much less deadly force, against Luyo. Nevertheless, and despite his earlier testimony about his excruciating knee pain, Moradi ran to Luyo's car, jumped in the back seat with the child, and started to fight Luyo for control of the car.

Four witnesses saw Moradi and Luyo fall out of the car's front seat, with Moradi on top of Luyo. Moradi then beat Luyo, also placing his hands around Luyo's neck, while blood gushed out of Luyo's body. Nobody saw Luyo fight back.

20

Even Moradi did not assert this happened, and he conceded he beat Luyo because he was angry. Luyo had cuts in his heart and one of the arteries leading away from it, and he needed urgent medical attention. He remained no threat to Moradi throughout this violent assault.

Then, Moradi started to drive Luyo's car towards the neighborhood exit with the child still in the back seat. Luyo hung onto the car, and his wounds supported multiple eyewitnesses' testimony that Moradi dragged him down the road. When Moradi crashed into an electrical pole, he stepped on Luyo, grabbed his sister's best friend's keys, and commenced his eight-day flight.

Moradi's behavior over this time further undermines his self-defense case. He told his friend that he could not be found and wished to flee to Tallahassee, despite talking to his lawyer minutes after stabbing and cutting Luyo eight times. He destroyed evidence or allowed his friend to destroy it for him. He hid out for eight days, and despite several calls with his lawyer geared towards getting Moradi to turn himself in, the U.S. Marshals ultimately arrested him with none of the phones he wanted to sell Luyo and no injuries.

We do not suggest that anyone in Moradi's situation has an obligation to speak to law enforcement, or that there is any one type of behavior that best supports the establishment of *Strickland* prejudice in a self-defense case. We note, however, that Moradi's behavior contrasts with that of at least one defendant who was able to

establish *Strickland* prejudice in such a case. *See McCullough v. State*, 327 So. 3d 955 (Fla. 5th DCA 2021) (granting postconviction relief involving confrontation with no other witnesses where forensic evidence equally supported victim's and movant's accounts, and movant remained at scene, cooperated with law enforcement, and encouraged police to seek recorded evidence of confrontation). And, although the fact of Moradi's flight is not dispositive, we are tasked with considering the entire record before us.[10] *See Strickland*, 466 U.S. at 695 ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."). Here, Moradi's conduct does nothing to strengthen his self-defense claim. It only weakens it.

Under these specific circumstances, we conclude Moradi cannot meet his burden to show *Strickland* prejudice, and the postconviction court properly denied his motion.

### C.    *Routenberg v. State*

Still, Moradi asserts that because of the *Routenberg* decision, "this is one of the rare cases where it is not appropriate to render a decision without a written opinion." Upon reflection, we agree. But *Routenberg* does not bind us. *See CED*

---

[10]    We note too that Florida courts deem such evidence relevant to a defendant's consciousness of guilt. *See Thomas v. State*, 748 So. 2d 970, 982 (Fla. 1999) ("In prior cases, we have upheld the introduction of similar flight evidence as consciousness of guilt where the defendant flees from police after committing a murder.") (citations omitted).

22

*Cap. Holdings 2000 EB, LLC v. CTCW-Berkshire Club, LLC*, 363 So. 3d 192, 195 (Fla. 6th DCA 2023) ("In addressing this disagreement between Florida's intermediary courts, we begin by repeating a well-known rule—that an appellate court is not bound by any of the decisions issued by its sister appellate courts."). It is also distinguishable on multiple grounds.

Routenberg was a drug dealer who represented himself at his murder trial. *Routenberg*, 301 So. 3d at 326. He often allowed his customers to stay at his home, including the decedent, a "little 115-pound girl." *Id*. at 326, 329. Law enforcement found her buried body in Routenberg's backyard six weeks after he killed her. *Id*. at 326–27. At first, Routenberg lied to police about the decedent's whereabouts, saying that he did not know where she was. *Id*. at 327. But when he learned police had found her body, he said he killed her in self-defense. *Id*. According to Routenberg, she tried to steal his oxycodone while brandishing a knife. *Id*. He said she cut him a few times before he could wrest the knife away, and he showed police his scars from the altercation. *Id*. He acknowledged that she "couldn't hurt him" but said he had been startled when she woke him up. *Id*. at 329.

Routenberg did not object to a jury instruction that required the state to prove the decedent committed robbery and aggravated battery against him. *Id*. at 328. His appellate counsel did not raise this error on direct appeal, and Routenberg petitioned for ineffective assistance of appellate counsel. *Id*. at 326. To prevail on such a

claim, a petitioner "must show: 1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance; and 2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result." *Wilson v. Wainwright*, 474 So. 2d 1162, 1163 (Fla. 1985). The *Routenberg* court conducted a fundamental error analysis, applying *Martinez*. *See* 301 So. 3d at 328–29 (citing *Martinez*, 981 So. 2d at 455). It reasoned that self-defense was Routenberg's only defense, and that his self-defense claim was "viable," and not, as in *Martinez*, "extremely weak" or "strain[ing] even the most remote bounds of credulity." *Id*. at 329–30 (quoting *Martinez*, 981 So. 2d at 456).

Moradi argues that *Routenberg* had the same jury instruction error, and its fundamental error analysis applied a more stringent standard than the *Strickland* prejudice analysis we conduct in his case. While this argument is understandable, it presupposes we agree with *Routenberg*'s outcome. Reasonable minds could differ on the *Routenberg* court's application of the *Martinez* fundamental error test, at least based on the limited facts contained in the opinion. But we need not express any conflict with our sister court's holding—which also addressed a different procedural posture and applied a different legal standard—when we can distinguish it on its facts.

24

There were no witnesses to Routenberg's and his victim's altercation. Other than Routenberg's wounds, the *Routenberg* court referenced no forensic evidence. Routenberg did not testify that he pursued and continued to attack the victim outside his property when he knew she was no longer a threat to him. Routenberg could prove the decedent had stabbed him—his alleged wounds had not disappeared after an eight-day flight out of town against his lawyer's best efforts to get him to turn himself in. We therefore decline to analogize *Routenberg* to Moradi's different and unique circumstances.

## IV. Conclusion

Postconviction cases analyzing *Strickland* prejudice, and the determinations that arise from them, are fact-specific, and they naturally invite comparison. We do not find the fact pattern in *Routenberg* a useful comparison to what happened in Moradi's case. Based on a diligent review of the unique facts contained in our extensive record, we conclude that Moradi failed to establish *Strickland* prejudice. There is no reasonable probability, even considering counsel's errors, that the result of this proceeding would have been different. *See Strickland*, 466 U.S. at 694. We therefore affirm.

AFFIRMED.

STARGEL and BROWNLEE, JJ., concur.

25

William R. Ponall, of Ponall Law, Maitland, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and Alyssa M. Williams, Assistant Attorney General, Daytona Beach, for Appellee.


NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED